IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| JOSHUA CACHO, a Florida resident, | § § § |
| **Plaintiff,** | § § |
| v. | § § § |
| MODERN CONCEPTS CONSTRUCTION LLC, d/b/a MC ROOFING & GC, a Florida Limited Liability Company, | § § § § § |
| **Defendant.** | § § § § |

6:23-CV-13

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.    The Plaintiff is JOSHUA CACHO ("Plaintiff") a natural person, resident of the Middle District of Florida, and was present in Florida for all calls, in this case in Seminole County, Florida.

2.    Defendant MODERN CONCEPTS CONSTRUCTION LLC, d/b/a MC ROOFING & GC ("MCSOLAR") is a Limited Liability Company organized and existing under the laws of Florida with its principal address located at 625 Palmer St Orlando, Florida 32801, United States, and can be served via registered agent Danny R Chopra at 625 Palmer St Orlando, Florida 32801, United States.

3.    Unnamed party United Energy ("UNITED") is a company that operates overseas and makes telemarketing phone calls at the direction and control of Defendant MCSOLAR.  United

is out of the reach and jurisdiction of the laws of the United States.

4.      Unnamed Party Ali Nickooii ("NICKOOII") is a natural person, Florida resident, and employee of MCSOLAR.

## JURISDICTION AND VENUE

5.      Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

6.      This Court has general personal jurisdiction over Defendant MCSOLAR as it's a Florida corporation.

7.      This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising under Florida Statutes § 501.059 and § 501.601 because the claims arise from the same nucleus of operative fact, i.e., Defendant's unauthorized automated robocalls to Plaintiff, and adds little complexity to the case.

## VENUE

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the automated robocalls and sale of goods and services directed at Florida residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.

9.      This Court has venue over Defendant MCSOLAR because the automated robocalls at issue were sent by or on behalf of the above-named Defendant to Plaintiff, a Florida resident.

## THE TELEPHONE CONSUMER PROTECTION ACT
## OF 1991, 47 U.S.C. § 227

10.     In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

11.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

12.     The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

13.     The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

14.     Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

15.     The TCPA provides a private cause of action to persons who receive calls in violation of 227(c) or a regulation promulgated there under. 47 U.S.C. § 227(c)(5).

16.     According to findings of the FCC, the agency vested by Congress with authority to issue

---

[1]*See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

17.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

18.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines. In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

19.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

20.     The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

21.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d

946, 951 – 52 (9th Cir. 2009).

22.     The TCPA defines an ATDS as "equipment which has the capacity – (A) to store or

produce telephone numbers to be called, using a random or sequential umber generator; and (B)

to dial such numbers. *Id.* at § 227(a)(1)

23.     As to what type of dialing equipment constitutes an ATDS, the TCPA vests to the Federal

Communication Commission ("FCC") the responsibility to promulgate regulations implementing

the TCPA's requirements. *Id.* at § 227(a)(1).

24.     Over the last nineteen years, the FCC has repeatedly recognized that a predictive dialer is

an ATDS that is subject to regulation by the TCPA. In its 2003 Order, the FCC also defined a

"predictive dialer" holding:

[A] predictive dialer is equipment that dials numbers and, when certain computer software is

attached, also assists telemarketers in predicting when a sales agent will be available to take

calls. The hardware, when paired with certain software, has the capacity to store or

produce numbers and dial those numbers at random, in sequential order, or from a database of

numbers. As commenters point out, in most cases, telemarketers program the numbers to be

called into the equipment, and the dialer calls them at a rate to ensure that when a consumer

answers the phone, a sales person is available to take the call.[1]

25.     In 2008, the FCC affirmed "that a predictive dialer constitutes an automatic

telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[2]

26.     A corporate officer involved in the telemarketing at issue may be personally liable under

the TCPA. *E.g., Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist.

LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate

actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FLORIDA STATUTES § 501.059

27.    Florida Statutes § 501.059 makes it a violation to "make or knowingly allow a telephone sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection to a number called without the prior express written consent of the called party." Fla. Stat. § 501.059(8)(a).

28.    A "telephone sales call" is defined as a 'telephone call, text message, voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes." Fla. Stat. § 501.059(j).

29.    "Prior express written consent" means an agreement in writing that: Fla. Stat. § 501.0059(g).

1. Bears the signature of the called party;

2. Clearly authorizes the person making or allowing the placement of a telephonic sales calls by telephone call, text message, or voicemail transmission to deliver or cause to be delivered to the called party a telephone sales call using an automated system for the selection or dialing of telephone numbers, the playing of a recorded message when a connection is completed to a number called, or the transmission of a

prerecorded voicemail;

3. Includes the telephone number to which the signatory authorizes a telephonic sales call to be delivered; and

4. Includes a clear and conspicuous disclosure informing the called party that;

    a. By executing the agreement, the called party authorizes the person making or allowing the placement of a telephonic sales call to deliver or cause to be delivered a telephonic sales call to the called party using an automated system for the selection or dialing of telephone numbers or playing of a recorded message when a connection is completed to a number called; and

    b. He or she is not required to directly or indirectly sign the written agreement or to agree to enter into such agreement as a condition of purchasing any property, goods, or services.

30.     A person aggrieved by a violation of this section may bring an action to recover actual damages or $500, whichever is greater.  Fla. Stat. § 501.059(10)(a)(2).

31.     If the court finds that the Defendant's willfully or knowingly violated this section or rules adopted pursuant to this section, the court may, in its discretion, increase the amount of the award to an amount equal to not more than three times the amount available under paragraph (a). Fla. Stat. § 501.059(10)(a)(2)(b).

## FLORIDA TELEMARKETING ACT

32.     A commercial telephone seller or salesperson making a commercial telephone solicitation call may not use technology that deliberately displays a different caller identification number than the number the call is originating from to conceal the true identity of the caller.  Fla. Stat. § 501.616(7)(b).

**33.**     A commercial telephone seller or salesperson may not transmit more than three commercial telephone solicitation phone calls from any number to a person over a 24-hour period on the same subject matter or issue, regardless of the phone number used to make the call. Fla. Stat. § 501.616(6)(b).

**34.**     In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or punitive damages, including costs, court costs, and attorney's fees.  No provision of this part shall be construed to limit any right or remedy provided under law.  Fla. Stat. § 501.625.

## FACTUAL ALLEGATIONS

**35.**     Plaintiff's personal cell phone ending in 3823 has been registered on the National Do-Not-Call Registry for more than thirty-one (31) days prior to the first automated robocall was received from Defendant MCSOLAR.

**36.**     Plaintiff personally registered the cell phone at issue in this case on the National-Do-Not-Call Registry on November 23, 2022.

**37.**     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

**38.**     Defendant MCSOLAR operates as a solar sales company.

**39.**     Defendant is aware of the requirements of the TCPA and FTSA and the National Do Not Call Registry, as they were sued before for this very matter, *See case - Tom v. Modern Concepts Construction LLC, No. 6:22cv01644 (FL.MD., Sept. 09, 2022),* however, continue to willfully ignore these requirements.

**40.**     Defendant MCSOLAR called Plaintiff a total of Fourteen (14) times, Thirteen (13) calls were unauthorized direct sales calls, and one (1) call was made using a pre-recorded message to initiate the call.

**41.**     **Call #1, DNC request #1**, *See Table A*, on January 28, 2023, at 6:03 PM, Plaintiff received a call to his cellular phone from 407-528-3291. Plaintiff answered with "hello" and was greeted by an artificial intelligence prerecorded marketing message.

**42.**     Plaintiff answered the questions and was transferred to a live agent. The agent asked Plaintiff his first and last name, Plaintiff replied "Samuel Rodriguez, but I'm not interested, and I'm on the Do Not Call list, so don't call me back".

**43.**     **Call #2, DNC request #2**, *See Table A*, on February 10, 2023, at 4:22 PM, Plaintiff received a call from 407-814-0167. Plaintiff answered with "hello" and was greeted by "Daniel from United Energy" asking for "**Samuel Rodriguez**". Plaintiff responded with "you have the wrong number, stop calling".

**44.**     Defendant MCSOLAR did not abide by the original DNC request from *Call #1, Paragraph 40.*

**45.**     **Call #3**, *See Table A*, on March 24, 2023, at 1:16 PM, Plaintiff received a call from 310-513-5033. Plaintiff answered with hello and was greeted by "Daniel from United Energy" asking to speak with "**Samuel Rodriguez**".

**46.**     Plaintiff engaged Daniel for the sole purpose of identifying the party(s) responsible for these calls. Daniel tried to set an appointment to have a representative view Plaintiff's home.

**47.**     Plaintiff agreed to this appointment if they were able to send an email with the individual's name, and company's information. Daniel stated this was not possible, Plaintiff disconnected the phone.

decided to not engage with them any further.

49.     **Calls #4-11,** *See Table A,* each call started the same, a telemarketer calling from "United Energy" asking to speak with "Samuel Rodriguez". The telemarketers used different first names, but Plaintiff disconnected the call each time after hearing what the call was about, and who they were asking for.

50.     **Call #12,** *See Table A,* on June 19, 2023, at 8:09 PM, Plaintiff received a call from 207-421-8423. Plaintiff answered with hello and was greeted by "Jason from United Energy" asking to speak with "Samuel Rodriguez". Plaintiff allowed Jason to set an appointment for a representative of their company to visit his residence. Plaintiff stated before the agent showed up to his house though that he would need an email from the agent directly, providing his name and company.

51.     Jason stated that he would make sure that the agent sent him an email within the next 2 days. Plaintiff provided Jason with the email address davecarr19992@gmail.com.

52.     **Call #13,** *See Table A,* on June 20, 2023, at 6:17 PM, Plaintiff received a call from 270-551-3451.  Plaintiff answered hello and was greeted by "Jack from United Energy" asking to speak with "Samuel Rodriguez". Plaintiff disconnected the call.

53.     **Call #14,** *See Table A,* on June 20, 2023, at 6:28 PM, Plaintiff received a call from 424-393-1157. Plaintiff answered with hello and was greeted by "Jack" from call #13, paragraph 51. Plaintiff disconnected the call.

54.     On June 21, 2023, Plaintiff received an email from ali.nickooii@apricotsolar.com, with the subject line "Some Details about Solar as you asked". *See Exhibit A.*

55.     On June 21, 2023, Plaintiff called Ali at the number he provided in his email, which was

321-430-4385, to ask if he was associated with the call he received a couple of days ago about solar, Ali replied "Yes, I said in the email that you spoke with Julian by mistake, Julian is the supervisor of Jason, the guy you spoke with".

56.    Ali stated the appointment that was set up by Jason for "today" would have to be rescheduled for "Friday", June 23, 21023. Plaintiff agreed to an appointment and time to have Ali come to his residence.

57.    Ali Nickooii arrived at Plaintiff's residence at or around 12:30 PM, and provided Plaintiff with his business card, detailing his employer as Defendant MCSOLAR. *See Exhibit B.*

58.    Table A below displays the calls received from Defendant MCSOLAR.

Table A

| NO. | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| 1 | Jan 28, 2023 | 6:03 PM | (407) 528-3291 | Jason - Energy Energy AI robot, DNC Request #1 |
| 2 | Feb 10, 2023 | 4:22 PM | (407) 814-0167 | Unauthorized direct sales call -Daniel- United Energy - Asking for Samuel Rodriguez, DNC Request #2 |
| 3 | Mar 24, 2023 | 1:16 PM | (310) 513-5033 | Unauthorized direct sales call -Daniel- United Energy - Asking for Samuel Rodriguez |
| 4 | Mar 24, 2023 | 1:17 PM | (310) 513-5033 | Unauthorized direct sales call -John- United Energy - Asking for Samuel Rodriguez |
| 5 | Mar 24, 2023 | 2:12 PM | (310) 513-5033 | Unauthorized direct sales call -Chris- United Energy - Asking for Samuel Rodriguez |
| 6 | May 04, 2023 | 3:06 PM | (346) 373-9894 | Unauthorized direct sales call -Tom- United Energy - Asking for Samuel Rodriguez |
| 7 | Jun 17, 2023 | 1:57 PM | (918) 395-6185 | Unauthorized direct sales call -Jason- United Energy - Asking for Samuel |

| NO. | Date | Time | Caller ID | Notes |
|---|---|---|---|---|
| | | | | Rodriguez |
| 8 | Jun 17, 2023 | 2:08 PM | (870) 373-5868 | Unauthorized direct sales call -Jason- United Energy - Asking for Samuel Rodriguez |
| 9 | Jun 17, 2023 | 7:55 PM | (419) 454-8225 | Unauthorized direct sales call -Daniel- United Energy - Asking for Samuel Rodriguez |
| 10 | Jun 17, 2023 | 7:55 PM | (419) 454-8225 | Unauthorized direct sales call -Daniel- United Energy - Asking for Samuel Rodriguez |
| 11 | Jun 17, 2023 | 7:58 PM | (316) 413-8411 | Unauthorized direct sales call -Jason - United Energy - Asking for Samuel Rodriguez |
| 12 | Jun 19, 2023 | 8:09 PM | (207) 421-8426 | Unauthorized direct sales call -Jason - United Energy - Asking for Samuel Rodriguez |
| 13 | Jun 20, 2023 | 6:17 PM | (270) 551-3451 | Unauthorized direct sales call -Jack- United Energy - Asking for Samuel Rodriguez |
| 14 | Jun 20, 2023 | 6:28 PM | (424) 393-1157 | Unauthorized direct sales call -Jack- United Energy - Asking for Samuel Rodriguez |

59. Plaintiff did not have an established business relationship with Defendant MCSOLAR, nor did Plaintiff consent to the automated prerecorded robocall or direct calls sent to his cell phone.

60. Plaintiff did not provide his phone number to Defendant at any point.

61. On June 28, 2023, Plaintiff sent an internal Do-Not-Call policy request to Defendant MCSOLAR to email MCSOLARus@gmail.com which is an email that was on the card left by Ali Nickooii.

62.     Despite this request for their internal DNC policies, Defendant MCSOLAR failed and/or refused to send Plaintiff a Do- Not-Call policy request.

63.     Upon information and belief, Defendant MCSOLAR did not have a written do-not-call policy while they were sending Plaintiff the calls.

64.     Upon information and belief, Defendant MCSOLAR did not train their employees who engaged in telemarketing on the existence and use of any do-not-call list.

65.     Such conduct violates the TCPA and its implementing regulations, 47 CFR § 64.1200(d)(3) (requiring telemarketers to honor and record DNC requests when made).

66.     Defendant knew or should have known that its conduct would violate the TCPA and its regulations because Defendant MCSOLAR has been sued prior to Plaintiff's filing of this Complaint.

67.     Defendant knew or should have known the requirements for making TCPA & FTSA compliant telemarketing calls and thus knew or should have known that the automated prerecorded message, the disregarded DNC request, and many unauthorized direct sales calls complained of herein violated the TCPA & FTSA and both of their regulations.

68.     No emergency necessitated these calls.

## VICARIOUS LIABILITY OF DEFENDANT MCSOLAR FOR PHONE CALLS PLACED BY UNITED

69.     MCSOLAR is vicariously liable for the telemarketing calls made by UNITED that generated the leads on their behalf.

70.     The FCC is tasked with promulgating rules and orders related to the enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

71.     The FCC has explained that it's "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

72.     The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

73.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

75.    The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at6587 ¶ 36 & n.107.

76.    To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

77.    Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

78.    Defendant MCSOLAR is legally responsible for ensuring that the affiliates that make telemarketing calls on its behalf comply with the TCPA when so doing.

79.    Defendant MCSOLAR knowingly and actively attempted to accept business that originated through illegal telemarketing.

80.    Defendant MCSOLAR knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketers to cease that conduct.

81.    By hiring a company to make calls on their behalf, Defendant MCSOLAR "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

82.     Moreover, Defendant MCSOLAR maintained interim control over the actions of their telemarketers.

83.     For example, Defendant MCSOLAR had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

84.     Furthermore, Defendant MCSOLAR had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using prerecorded messages to contact potential customers of Defendant MCSOLAR and the ability to require them to respect the National Do Not Call Registry.

85.     Defendant MCSOLAR also gave interim instructions to their telemarketers by providing lead-qualifying instructions and lead volume limits.

86.     Defendant MCSOLAR donned their telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched "solar panel installation" in the abstract.

87.     Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

88.     "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

89.     A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

90. Defendant MCSOLAR's telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant MCSOLAR. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

91. Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

92. Defendant MCSOLAR is the liable party as the direct beneficiary of the illegal telemarketing as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for "solar panel installation" on their behalf

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES

## AS A RESULT OF THE CALLS

93. Defendant MCSOLAR's calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

94. Defendant MCSOLAR's calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

95. Defendant MCSOLAR's calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

96. Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of Plaintiff's cell phone.

## PLAINTIFF'S CELL PHONE IS A RESIDENTIAL NUMBER

97.     The calls were to Plaintiff's cellular phone number 407-577-3823 which is Plaintiff's

personal cell phone that he uses for personal, family, and household use. Plaintiff maintains no

landline phones at his residence and has not done so for at least 15 years and primarily relies

on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone

for navigation purposes, sending and receiving emails, timing food when cooking, and sending

and receiving text messages. Plaintiff further has his cell phones registered in his personal

name, pays the cell phone from his personal accounts, and the phone is not primarily used for

any business purpose.

## CAUSES OF ACTION:

## COUNT ONE:

### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent

98.     Plaintiff re-alleges and re-adopts paragraphs 1 through 97 of the Complaint as if

fully set forth herein.

99.     Defendant MCSOLAR and/or their affiliates or agents violated the TCPA, 47 U.S.C.

§ 227(b)(1)(A)(iii), at least one (1) time by placing non-emergency telemarketing automated

prerecorded messaged calls to Plaintiff's cellular telephone number without prior express

written consent.

100.    Plaintiff was statutorily damaged at least one (1) time under 47 U.S.C. § 227(b)(3)(B)

by Defendant by the calls described above, in the amount of $500.00 per call.

101.    Plaintiff was further statutorily damaged because Defendant MCSOLAR

willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

**102.**    Plaintiff is also entitled to and does seek an injunction prohibiting Defendant MCSOLAR and their employees, affiliates, and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing automated prerecorded messaged calls to any cellular telephone number without prior express written consent.

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

**103.**    Plaintiff re-alleges and re-adopts paragraphs 1 through 97 of the Complaint as if fully set forth herein.

**104.**    Defendant MCSOLAR called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls, for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

**105.**    Plaintiff was statutorily damaged at least fourteen (14) times under 47 U.S.C. § 227(c)(3)(F) by Defendant MCSOLAR by the telemarketing automated prerecorded message calls described above, in the amount of $500.00 per call.

**106.**    Plaintiff was further statutorily damaged because Defendant MCSOLAR willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

**107.**    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:
### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

**108.**    Plaintiff re-alleges and re-adopts paragraphs 1 through 97 of the Complaint as if fully set forth herein.

**109.**    The foregoing acts and omissions of Defendant MCSOLAR and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing solicitations despite lacking the following:

  a.  A written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[2]

  b.  Training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[3]; and,

  c.  In the solicitations, the name of the individual caller and the name of the person or entity on whose behalf the call is being made, in violation of 47 C.F.R. § 64.1200(d)(4).[4]

**110.**    Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47 U.S.C. § 227(c)(5)(B).

**111.**    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5).

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).
[4] *See id.* at 425 (codifying a June 26, 2003 FCC order).

## COUNT FOUR

### (Violations of Florida Statutes § 501.059)

112.    Plaintiff re-alleges and re-adopts paragraphs 1 through 97 of the Complaint as if fully set forth herein.

113.    Defendant MCSOLAR and/or their affiliates and authorized representatives called Plaintiff using automated means without Plaintiff's express written consent. Fla. Stat. § 501.059(8)(a).

114.    Defendant MCSOLAR did not have Plaintiff's prior express written consent when making the telephonic solicitation calls. Fla. Stat. § 501.059(1)(g).

115.    Plaintiff is entitled to an award of at least $500 in damages for each such violation of Fla. Stat. § 501.059(8)a) pursuant to Fla. Stat. § 501.059(10)(a)(2).

116.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. Fla. Stat. § 501.059(10)(a)(b).

## COUNT FIVE

### (Violations of Florida TELEMARKETING ACT)

117.    Plaintiff re-alleges and re-adopts paragraphs 1 through 97 of this Complaint as if fully set forth herein.

118.    Defendant MCSOLAR called Plaintiff more than three times within a 24-hour period. Fla. Stat. 501.616(6)(b).

119.    Defendant MCSOLAR and/or their affiliates and authorized representatives called

identification information. Fla. Stat. 501.616(7)(b).

Case 6:23-cv-01316-PGB-LHP   Document 1   Filed 07/14/23   Page 22 of 23 PageID 22

120.     In addition to any other penalties or remedies provided under law, a person who is injured by a violation of the provisions of this part may bring a civil action for recovery of actual damages and/or penalties and/or punitive damages, including costs, court costs, attorney's fees. No provision of this part shall be construed to limit any right or remedy provided under law.  Fla. Stat. 501.625.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Joshua Cacho prays for judgment against Defendant MCSOLAR as follows:

A.     Leave to amend this Complaint to name additional DOESs as they are identified and to conform to the evidence presented at trial;

B.     A declaration that actions complained of herein by Defendant violates the TCPA and Fla. Stat. 501.059 and Florida Telemarketing Act;

C.     An award of $1500 per call in statutory damages arising from the TCPA 54 U.S.C§227(b) intentional violations jointly and severally against the corporations for 1 call.

D.     An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C §227(c) intentional violations jointly and severally against the corporations for 14 calls.

E.     An award of $1500 per call in statutory damages arising from the TCPA 47 U.S.C § 227(c)(5) intentional violations jointly and severally against the corporations

for 14 calls.

F.      An award of $1,500 per call in statutory damages arising from Fla. Stat. §

501.059(1)(g) intentional violations, pursuant to Fla. Stat. § 501.059(10)(a)(b) for

14 calls.

G.      An award of $50,000 in punitive damages arising from intentional violations

of Fla. Stat. 501.616(6)(b)

H.      An award of $50,000 in punitive damages arising from intentional violations

of Fla. Stat. 501.616(7)(b).

I.      An award to Plaintiff of interest, costs, and attorneys' fees, as allowed by law

and equity.

J.      Such further relief as the Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so

tried. July 14th 2023    Respectfully

*Joshua Cacho*

Joshua Cacho
Plaintiff, Pro Se
164 Estella Rd
Lake Mary, Florida
407-577-3823